**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| SCOTT RABIN, | ) | |
| | ) | |
| Plaintiff, | ) | 09 C 8049 |
| | ) | |
| vs. | ) | Honorable Judge |
| | ) | Elaine Bucklo |
| OFFICER FLYNN #10317, OFFICER | ) | |
| KNEPPER #10958, OFFICER QUINLAN | ) | Magistrate Judge Nolan |
| UNKNOWN SUPERVISORS, COOK | ) | |
| COUNTY, COOK COUNTY SHERIFF | ) | |
| THOMAS DART in his official capacity and | ) | |
| the COOK COUNTY SHERIFF'S OFFICE, | ) | |
| | ) | |
| Defendants. | ) | |

**DEFENDANT'S LOCAL RULE 56.1(a)(3) STATEMENT OF**
**MATERAL FACTS AND SUPPORTING EXHIBITS**

NOW COME Defendants, OFFICER FLYNN, OFFICER KNEPPER, OFFICER QUINLAN, COOK COUNTY SHERIFF THOMAS DART and COOK COUNTY, by their attorney, ANITA ALVAREZ, State's Attorney of Cook County, and through her Assistant, David R. Condron, and submit pursuant to Local Court Rule 56.1 this statement of facts in support of their Motion for Summary Judgment against Plaintiff, Scott Rabin. In support thereof, Defendants state as follows:

1. Scott Rabin ("Plaintiff") is self-employed as a private detective and resides in Deerfield, Illinois. Def's Ex. 2, Plaintiff's Deposition, p. 6, lines 14 - 20.

2. Most of Plaintiff's clients are law firms or lawyers. Plaintiff's duties include process serving and research *Id.*, p. 9, lines 13, 14, lines 4 - 8.

3. Plaintiff was previously employed by the Chicago Police Department from March, 1987 until September or October of 1997. Plaintiff's duties included working as a Patrol Officer

with the Chicago Police Department for three or four years. *Id.* p. 16, lines 8 – 14. p. 18, lines 3 - 12.

4. On December 14, 2009, Plaintiff went to serve an "Order Appointing Receiver" at an office at 750 Lake Cook Road, Buffalo Grove, Illinois. *Id.,* p. 43, lines 10 - 21.

5. On that same day he parked his car in the parking lot of 750 Lake Cook Road and noticed an unmarked Sheriff's car sitting in the circular part of the turnaround on his way in to the building. *Id.* p. 47, lines 2 – 9, 22 – 24.

6. Plaintiff served papers inside the building. After serving the papers, Plaintiff walked out of the building. *Id.* p. 49, lines 13 – 14, p. 50, lines 1 – 3.

7. At that time, Plaintiff was wearing a blue shirt, a turtleneck and jeans. Plaintiff had his gun holstered toward the back of his hip. Plaintiff did not have a coat on. *Id.* p. 50, lines 4 – 19.

8. Deputy Flynn was assigned to the Civil Process division on December 14, 2009 and was assigned to work civil process on the north end of Cook County. Defendants' Ex. 3, Flynn's deposition, p. 25, lines 4 – 10, p. 29, lines 3 – 5.

9. As a Deputy Sheriff, Flynn has arrest powers. *Id.* p. 20, lines 15 – 17.

10. On December 14, 2009, at approximately 2:42 hours, Deputy Flynn served process at 750 Lake Cook Road. *Id.* P. 68, lines 17 – 21.

11. After Flynn served process he observed Plaintiff going into the building. Flynn observed Plaintiff to keep turning around and looking at Flynn as Plaintiff was going into the building. *Id.,* p. 69, lines 22 – 24, p. 70, lines 18 – 20.

12. It appeared to Flynn that Plaintiff had a gun on his side. *Id.*, p. 70, lines 23 – 24.

13. Flynn then notified his radio room via his radio. Flynn was wearing his dark blue uniform, a vest and his duty belt. *Id.,* p. 71, lines 4 – 18.

14. Flynn did not have a police computer in his squad car. He looks up or runs someone's name by getting it on his radio. *Id.,* p. 72, lines 18 – 20, p. 73, lines 7 – 11.

15. Flynn informed his dispatch that he had a man who had a gun that just walked passed him going into a building at his location. *Id.*, p. 74 lines 4 – 8.

16. Plaintiff had been in the building for a couple of minutes. Flynn then observed Plaintiff coming out of the building. Flynn approached Plaintiff and asked Plaintiff if he was armed. *Id.*, p. 75, lines 16 – 23.

17. While plaintiff was exiting the building, he had a bulge in the area where his gun and his holster were located. Defendants' Exh. 2, Plaintiff's deposition, p. 51, lines 4 – 8.

18. Flynn asked Plaintiff if he was armed and Plaintiff said that he was armed. Defendants' Exhibit 2, Flynn's deposition, p. 76, lines 2 - 5.

19. Flynn did not have his weapon drawn. *Id.,* p. 75, line24, p. 76. Line 1.

20. Flynn asked Plaintiff if he was "on the job" and Plaintiff responded no. *Id.*, p. 76, lines 9 – 11.

21. In police vernacular, "on the job" means that you are a cop. Plaintiff understood what "on the job" meant. *Id.,* p. 76, lines 12 – 16, p. 77, lines 3 – 5.

22. Plaintiff then asked Flynn if he knew Plaintiff's rabbi named Rabbi Wolf, who is also the rabbi for the sheriff's department. *Id.,* p. 77, lines 19 – 21.

23. Flynn asked Plaintiff why he was carrying a gun and Plaintiff responded that he was once a deputy sheriff and that he left the sheriff's department and he went to Chicago. *Id.,* p. 78, lines 9 – 16.

24. Flynn then asked the Plaintiff if he was with Chicago now and Plaintiff said no. *Id.,* p. 78, lines 15, 16.

25. Flynn asked Plaintiff again why he was carrying a gun or was armed and Plaintiff said he had a TAN card. *Id.,* p. 78, lines 20 – 22.

26. Flynn did not know what a TAN card was at that time. *Id.,* p. 78, lines 23, 24.

27. Four Buffalo Grove Police Officers arrived on the scene. *Id.*, p. 84, lines 16, 17.

28. Flynn recovered Plaintiff's driver's license, an FOID card, a TAN card and an investigator's license. Flynn asked dispatch to run the TAN Card through a system called LEADS and the dispatcher responded that he had to call the Springfield desk for to find out about the card. Plaintiff was still in possession of the gun at that point. *Id.*, p. 85, lines 8 – 10. p. 134, lines 22 – 24, p. 135, lines 1 – 2, p. 137, lines 14 – 17.

29. The Firearm Control Card is known as a TAN card and is a card that Plaintiff calls it a concealed carry card. Defendants Exhibit No. 2, Plaintiff's deposition, p. 13, lines 16 – 18.

30. The TAN card or Firearm control card does not indicate on the front or the back of the card that Plaintiff is authorized to carry a concealed weapon. *Id.*, p. 59, lines 5 – 15.

31. Plaintiff's FOID card indicates "This card does not permit bearer to unlawfully carry or, unlawfully or use firearms. This does not authorize the carrying of a concealed weapon." *Id.*, p. 58, lines 20, 24, p. 59, lines 1 – 4.

32. Flynn contacted his dispatch again from approximately 3:09 p.m. to 3:10 PM to see if anyone got information on the TAN card from Springfield and Flynn was advised that Springfield did not know anything about the TAN card. Defendants' Exh. 3, Flyyn's deposition, p. 142, lines 19 – 21, p. 143, lines 10 – 17.

33. On December 14, 2009, Deputy Knepper ("Knepper") heard over his radio that Flynn had a subject with a gun. Knepper was then requested to go to 750 Lake Cook Road to secure the

4

scene to ensure everyone's safety and to report back. Defendants' Exh. 4, Knepper's deposition, p. 53 lines 14 – 17, p. 54 , lines 17 – 24, p. 55, line 1.

34. Knepper was in uniform and was driving an unmarked squad car. His squad car was not equipped with a computer. *Id.*, p. 57, lines 20, 21, p. 58, lines 12, 13,

35. When Knepper arrived, Flynn was standing next to Plaintiff and Buffalo Grove Police Officers were on scene. *Id,* p. 68, lines 15 – 17.

36. Knepper has police and arrest powers and did have arrest powers in December, 2009. *Id.*, p.84, lines 12 – 15.

37. Knepper asked Flynn if Plaintiff was the subject with a gun and Flynn told him yes. Knepper placed handcuffs on Plaintiff. *Id.*, p. 68, lines 22- 24, p. 69, line 1.

38. Flynn lifted up Plaintiff's shirt and took Plaintiff's gun out of the holster. Defendants' Exh. 3, Flynn's deposition, p. 101, lines 7- 9

39. Both Knepper and Flynn cleared the weapon because Flynn had difficulty clearing the weapon. Defendants' Exh. 4, Knepper's deposition, p. 91, lines 14 - 19.

40. Knepper observed that Plaintiff's gun was fully loaded. *Id.*, p. 140, lines 13,14.

41. "Cleared" means the weapon was unloaded and rendered safe. *Id.*, p. 91, lines 12 – 13.

42. Plaintiff was then moved from the sidewalk area to Knepper's vehicle. *Id.,* p. 93, lines 20 – 21.

43. Plaintiff was moved towards Knepper's vehicle because they were in a public walkway and it was safer for everyone if Knepper had control. *Id.*, p.94, lines 1 – 4.

44. A couple of minutes approximately passed from the time Knepper handcuffed the Plaintiff until the time that Deputy Quinlan arrived on the scene. *Id.*, p. 94, lines 14 – 16.

45. Deputy Quinlan (Quinlan) was assigned to the civil process division and had arrest powers starting in September, 2009. Defendants' Exh. No. 5, Quinlan's deposition, p. 42, lines 2 – 5.

46. On December 14, 2009 Quinlan was on duty and in the town of Des Plaines, Illinois when he received a cell phone call from Sergeant Caban. *Id.*, p. 75, lines 12 – 18, p. 76 lines 1, 2.

47. Sergeant Caban told Quinlan to proceed to 750 Lake Cook Road and assist Flynn relating to a man with a gun. *Id.*, p. 78, 3 – 8.

48. Quinlan was driving an unmarked caged squad car. It took Quinlan about 13 minutes to get to 750 Lake Cook Road. *Id.*, p. 88, lines 11, 12.

49. When Quinlan arrived, he drove into the parking lot, into a turn, or cul-de-sac near the front door of the building. *Id.,* p. 90, lines 19 – 24, p. 91, lines 1 – 3.

50. Quinlan observed there to be two unmarked squad cars and one Buffalo Grove Squad car parked in the cul-de-sac. *Id.,* p. 93, 15 – 24, p. 94, lines 9 – 22.

51. When Quinlan arrived, Flynn advised Quinlan that Flynn had noticed Plaintiff walk into the building with a bulge on his hip, what Flynn believed to be a weapon. Flynn further advised Quinlan that he saw Plaintiff exit the building and that Flynn had a conversation with Plaintiff about what was on his hip and Flynn generally advised Quinlan what took place up to the point that Quinlan arrived *Id.,* p. 95, lines 18 – 24, p. 96, lines 1 – 2.

52. Quinlan did not know what a TAN card was at the time of this incident. *Id.,* p. 100, lines 6, 7.

53. Prior to this incident, Quinlan had never encountered someone with a private detective's license. *Id.*, p. 102, lines 9 – 11.

6

54. Quinlan was advised that if an arrest was to be made, Quinlan was going to be the arresting officer and Flynn was to be the assisting officer. *Id.*, p. 97, lines 7, 8.

55. Knepper brought Plaintiff over to Quinlan and Plaintiff was placed in the back seat of Quinlan's squad car. Defendants' Exhibit No. 4, Knepper's deposition, p. 95, lines 14, 15, p. 96, lines 11, 12.

56. Plaintiff told Knepper that the cuffs were tight and he asked that they be taken off. Defendants' Exh No. 2, Plaintiff's deposition, p. 82, lines 2- 6.

57. Quinlan then took Knepper's handcuffs off of Plaintiff and Quinlan put his own handcuffs on Plaintiff. Defendants' Exh. No. 5, Quinlan's deposition, p. 103, lines, 16 – 18.

58. Plaintiff asked Knepper if he could leave the handcuffs off and said "I've got a bad neck" and I've had a bad hand in the past." Defendants' Exhibit No. 2, Plaintiff's deposition, p. 84, lines 1 – 6.

59. Plaintiff told Knepper that the second pair of cuffs were tighter than the first pair. *Id.*, p. 85, lines 15 – 21.

60. Quinlan put handcuffs on Plaintiff for officer safety purposes. Plaintiff's belongings, including the gun, were placed in the trunk of Quinlan's car. Defendants' Exhibit No. 5, Quinlan's Deposition, p. 103, lines 19 – 21.

61. Plaintiff sat in the back of Quinlan's squad car for approximately 15 minutes. *Id*, p. 105, lines 6 – 8.

62. Quinlan un-handcuffed the Plaintiff and Plaintiff was placed in a Buffalo Grove Police squad car.

63. Plaintiff was taken to the Buffalo Grove Police Department where his belongings were returned to him.

7

64. Plaintiff was never advised of his Miranda rights at any point. Defendants' Exh. 2, p. 70, lines 5 – 7.

65. Officer Thomas Derken (Derken) has been employed with the Buffalo Grove Police Department since 1993. Defendants' Exh. 6, Derken's deposition, p. 7, lines 19 – 21.

66. Derken previously worked in the traffic unit and also worked as the chief evidence technician for the Lake County major crimes task force for 6 years. *Id.*, p. 8, lines

67. Derken's current position or assignment is Patrol. *Id.*, p. 8.

68. On December 14, 2009, Derken responded to a call from his central dispatch for a man with a gun. *Id.*, p. 10, lines 8 – 13, p. 12, lines 17 – 21.

69. Derken responded and activated his emergency lights. *Id*. p. 15, lines 18 – 19.

70. Since Derken had worked for Buffalo Grove, he had never encountered a private detective who was carrying a weapon. *Id.*, p. 21, lines 17 – 19.

71. This was the first time that Derken encountered a Firearms Control Card, or what is referred to as a TAN card. *Id.*, p. 22, lines 6 – 14.

72. Derken learned about what a private detective license and a TAN card was after the incident, when he spoke to Sylvia Perez from the Illinois Department of Finance and Professional Regulation. *Id.*, p. 22, lines 18 – 22.

73. Derken does not recall the Plaintiff ever showing him any marks on Plaintiff's wrists. *Id.,* p. 32, lines 1 – 3.

74. Derken indicated that there was some uncertainty about the TAN card and the fact that there was no indication on Plaintiff's TAN card whether Plaintiff could carry a concealed weapon. *Id.*, p. 44, lines 3 – 14.

75. When Derken is out on a call on the street, he generally does not consult with the Lake County State's Attorney's Office. *Id.*, p. 45, lines 12 – 17.

76. Derken did speak to someone from the Lake County State's Attorney's Office during the incident. *Id.*, p. 45, lines 18 – 21.

77. After Derken spoke to the Lake County State's Attorney's Office, he advised his supervisor and the Cook County Deputies. After that, the decision was made to return the Plaintiff his belongings. *Id.,* p. 46, lines 11 – 16.

78. Derken does not recall The Plaintiff ever being processed for any type of charge. *Id.*, p. 44, lines 15 – 17.

79. Derken was the one who drove Plaintiff back to the Buffalo Grove Police Station and he does not recall Plaintiff ever complaining about his handcuffs being too tight and he does *Id.*, p. 31, lines 17 – 24.

                                      Respectfully submitted,
                                      ANITA ALVAREZ
                                      State's Attorney of Cook County
                                      <u>/s/ David R. Condron</u>
                                      David R. Condron
                                      Assistant State's Attorney
                                      500 Richard J. Daley Center
                                      Chicago, IL 60602